MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 6
Docket:      Cum-19-239
Argued:      October 7, 2019
Decided:     January 21, 2020
Revised:     June 18, 2020

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, and HUMPHREY, JJ.*

## A.I.

v.

## STATE OF MAINE

SAUFLEY, C.J.

[¶1]  A.I. was less than fifteen years old during the events in question in this appeal.  He had been charged with multiple juvenile offenses, and the District Court (Portland, *Kelly, J.*) ordered him held at Long Creek Youth Development Center while awaiting trial on those charges.  After a hearing, the proceedings were suspended when he was determined to be, at least temporarily, incompetent to stand trial.  Shortly thereafter, he filed a petition for habeas corpus seeking release from Long Creek, and he now appeals from the resulting judgment in which his petition was denied by a single justice of the Supreme Judicial Court (*Gorman, J.*).

---

* Although Justice Hjelm participated in the appeal, he retired before this opinion was certified.

[¶2]  Prior to oral argument on his appeal, the youth received the relief that he had requested—transfer to an appropriate residential treatment facility—and the District Court (*Powers, J.*) subsequently dismissed all charges against him.  The State moved to dismiss the appeal on grounds of mootness.  The youth opposed the motion.  Although we recognize the important public interests involved in the incarceration and treatment of Maine's youth, we conclude that the unique facts of this case preclude us from announcing any opinion that could guide future cases, and we dismiss the appeal as moot.

## I.  BACKGROUND

[¶3]   Twelve[1] juvenile petitions filed by the State against the youth initiated the State's latest involvement with A.I.  On October 1, 2018, the District Court (*Kelly, J.*) entered an order of detention directing that the youth be detained at Long Creek while awaiting resolution of the pending juvenile charges.  Between October 1, 2018, and June 10, 2019, the court held several detention hearings.  *See* 15 M.R.S. § 3203-A(5) (2018).  During that time, the court issued eight orders of detention, none of which was appealed.  *See*

---

[1]  The State initially filed fourteen petitions, but it dismissed two of them on June 5, 2019.

15 M.R.S. § 3402(1)(D) (2018). The youth remained at Long Creek throughout those proceedings.

[¶4] On April 23, 2019, following a competency hearing, the court (*Powers, J.*) found that the youth was not competent to proceed with an adjudication on the charges and suspended the proceedings. *See* 15 M.R.S. § 3318-A (2018). Pursuant to 15 M.R.S. § 3318-B(1) (2018), however, the court also found a substantial probability that the youth would become competent to stand trial in the foreseeable future. In compliance with the same statute, the court referred the youth to the Department of Health and Human Services (DHHS) for evaluation and treatment of his mental health and behavioral needs. Two days later, the youth filed a motion for contempt, alleging that DHHS had failed to comply with the order finding him currently incompetent to stand trial. The motion was later withdrawn without prejudice.

[¶5] On May 14, 2019, the youth filed a petition for a writ of habeas corpus before a single justice of the Supreme Judicial Court (*Gorman, J.*). A hearing was conducted within three weeks of the petition, on June 6, 2019. On June 10, 2019, the single justice denied the youth's petition for writ of habeas corpus, and he appealed, bringing the matter before us. Before the oral

4

argument on the appeal, the youth was released from Long Creek and placed in a residential treatment facility, and the charges against him were dismissed.

## II. DISCUSSION

[¶6] Notwithstanding the focused advocacy of the youth's attorney and the prompt action of the courts, A.I. remained incarcerated at Long Creek for nearly four months following the order finding him incompetent, until his transfer to an out-of-state residential treatment facility with adequate treatment. It is the delay in accomplishing that appropriate placement that forms the gravamen of this appeal.

[¶7] Before reaching the merits of the youth's arguments regarding that delay, we must first consider the justiciability of the appeal. Along with his arguments on the merits, the youth asserts (A) that his appeal is not moot because the State retains the power to return him to Long Creek and, alternatively, (B) that even if his appeal is moot, it is appropriate for us to review the appeal because his case fits exceptions to the mootness doctrine.

A.    Mootness

[¶8] Except in extraordinary circumstances, addressed below, we will not address issues that have lost their controversial vitality. *Leigh v. Superintendent, Augusta Mental Health Inst.*, 2003 ME 22, ¶ 6, 817 A.2d 881.

Here, there is no question that the appeal is moot; the youth is receiving treatment outside of Long Creek, and all charges have been dismissed. He is not presently at risk of incarceration at Long Creek. While this appeal has been pending, the District Court (*Powers, J.*) ultimately found him incompetent to proceed, with no substantial probability of becoming competent in the foreseeable future, and it dismissed all underlying juvenile charges against him. There is no decision that we could announce in this habeas corpus appeal that would have any effect on the youth himself. Thus, there can be no question that the case is moot. *See id.* ¶ 8. The only question is whether there exists an exception to the mootness doctrine that would cause us to address the merits of the appeal.

B.     Exceptions to the Mootness Doctrine

[¶9] Cases that are moot may nonetheless be considered if at least one of the three narrow exceptions applies. *Mainers for Fair Bear Hunting v. Dep't of Inland Fisheries & Wildlife*, 2016 ME 57, ¶ 7, 136 A.3d 714. Specifically, we may consider an appeal despite its mootness if

> (1) sufficient collateral consequences will result from the determination of the questions presented so as to justify relief; (2) the appeal contains questions of great public concern that, in the interest of providing future guidance to the bar and public we may address; or (3) the issues are capable of repetition but evade review because of their fleeting or determinate nature.

*Id.* (quoting *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1380 (Me. 1996)). The youth argues that the exceptions to the mootness doctrine for both questions of great public concern and issues capable of repetition but evading review apply.

[¶10]  We are not persuaded that this is an issue that falls within the exception for issues capable of repetition but evading review, particularly given the youth's access to prompt and repeated detention review hearings, *see* 15 M.R.S. § 3203-A(11) (2018), any of which could have been appealed, *see* 15 M.R.S. § 3402(1)(D), and prompt access to a habeas corpus hearing, which was addressed quickly through appeal. *See Leigh*, 2003 ME 22, ¶ 8, 817 A.2d 881.

[¶11]  We next consider whether the mootness exception relating to matters of great public concern applies here. When addressing the exception for "questions of great public concern," we examine "whether the question is public or private, how much court officials need an authoritative determination for future rulings, and how likely the question is to recur." *Brunswick Citizens for Collaborative Gov't*, 2018 ME 95, ¶ 9, 189 A.3d 248 (quoting *Mainers for Fair Bear Hunting*, 2016 ME 57, ¶ 8, 136 A.3d 714). On this issue, the youth refers to the State's interest in protecting minors with cognitive challenges and urges

us to announce new law providing guidance to the courts, state agencies, and the public.

[¶12]   We are fully persuaded that the State's policies and the Court's jurisprudence relating to the incarceration of Maine's youth are "of great public concern."[2]   *See, e.g.*, *State v. J.R.*, 2018 ME 117, ¶¶ 11-14, 27, 191 A.3d 1157 (discussing the importance of rehabilitative treatment for incarcerated youth and decrying the lack of available state resources addressing the issue). Decisions by the Legislature allocating the State's fiscal resources and decisions by the Executive Branch creating policies related to the use and coordination of State resources have been a recent focus of significant public attention, particularly as they apply to Maine's youth.[3]

---

[2]  To be clear, neither the public's interest in governmental actions regarding resources and institutions, nor the public's interest in the substance of Law Court opinions on these issues, authorizes the release to the public of personal or identifying information regarding this youth. P.L. 2019, ch. 525, § 17 (effective September 19, 2019) (to be codified at 15 M.R.S. § 3308(1-A) (2018)).

[3]  For example, the Legislature recently formed The Task Force on Alternatives to Incarceration for Maine Youth to improve the efficacy of the juvenile justice system.  L.D. 1108, Emergency Preamble (129th Legis. 2019).  The Executive Branch has undertaken similar initiatives, supporting the Juvenile Justice Advisory Group and reinvigorating the Children's Cabinet, with a focus on Maine's youth.  Information regarding the Advisory Group is available on the website of the Maine Department of Corrections at https://www.maine.gov/corrections/jjag/about.htm, and information regarding the Children's Cabinet is available on the website of the Governor's Office of Policy Innovation and the Future at https://www.maine.gov/future/initiatives/childrens-cabinet (last visited Jan. 6, 2020). These matters have also been the subject of recent litigation.  *See State v. J.R.*, 2018 ME 117, ¶ 33, 191 A.3d 1157 (Saufley, C.J., concurring) ("We, in government, must find additional alternatives for our children and youth.  That continuum of care should include both well-proven and promising innovative programs, including such options as evidence-based

[¶13]  Furthermore, the matter before us is directly relevant to actions of government regarding resource allocations and State agency actions.  As the circumstances of this case demonstrate, when a youth is deemed incompetent to stand trial and continues to be held in a State detention facility, State agencies will have urgent—but differing and sometimes overlapping—responsibilities.[4] Those agencies must work together to ensure that services provided pursuant to those responsibilities are coordinated, and, particularly with regard to services for the restoration to competency of an incarcerated youth, are expedited.  *Cf. T.L. v. State*, 670 So. 2d 172, 174 (Fla. Ct. App. 1996) (holding that Florida's "statutory scheme clearly recognize[d] the need for significant interplay between" the Department of Juvenile Justice and the Department of Health and Rehabilitative Services).

[¶14]  In the matter before us, DHHS was ordered by the court to evaluate and treat the youth's mental health and behavioral needs or provide services specifically for purposes of "stabilization."[5]  At the same time, because the youth

---

behavioral modification programs, residential treatment facilities, [and] enhanced mental health treatment services . . . .").

[4] We note that the manner in which the State agencies collaborated to address this youth's needs was not an exemplar of efficiency.  Indeed, at oral argument, the State recognized that its "coordination could have been better."

[5] No one disputed the youth's significant needs, or the fact that he could not be returned to his mother's home.  The youth's mother initially would not agree to an out-of-state placement.  Similarly,

had been declared at least temporarily incompetent and he remained incarcerated, the State was responsible to provide the services and treatment necessary to restore the youth to competency. *Cf. Haraden v. State*, 2011 ME 113, ¶ 20, 32 A.3d 448 (discussing the Department of Corrections' responsibility during the period of a petitioner's incompetence); *cf. Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) ("Incapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment."); *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998, 1011 (D. Utah 2016) (discussing a state agency's responsibility to render competency restoration services).

[¶15] As the State agrees, although stabilization and competency restoration treatment modalities may overlap, their purposes are distinct. *Cf. Or. Advocacy Ctr.*, 322 F.3d at 1120 ("Although jails can sometimes provide treatment to stabilize a patient, they cannot restore a patient to competency."). When a youth has been determined to be incompetent and yet *remains incarcerated*, the treatment and services necessary for restoration to

---

the youth himself would not consent to a transfer to a treatment facility in Maine where he alleged that he had previously been mistreated, and the few potential Maine facilities simply could not accept the youth given the high level of care he required.

competency will naturally take precedence over other needs, absent the agreement of the youth and his parents or custodians.

[¶16]  In this case, the State's efforts to find a suitable placement that could meet the competency restoration and treatment needs of this youth were indisputably hindered by Maine's lack of a meaningful continuum of care for youth-focused residential and home-like treatment resources.  On this point, the absence of appropriate alternatives for meeting the youth's urgent need for restoration to competency is an explanation for—but a tenuous defense to— the delay.  We have no difficulty concluding in this context that the allocation of State resources needed to address the resource gaps at issue here, the coordination among State agencies of responses to the youth's needs, the determination of the treatments that must receive the highest priorities, and the court's continuing oversight of the youth's incarceration all implicate the actions of government at the broadest levels.  Accordingly, the public nature of the issues raised in this appeal has certainly been demonstrated.

[¶17]  The ability of the Court to fashion an "authoritative determination for future rulings," however, is not present in this case.  *See Sparks v. Sparks*, 2013 ME 41, ¶ 11, 65 A.3d 1223 (quotation marks omitted); *see also In re Steven L.*, 2014 ME 1, ¶ 8, 86 A.3d 5 ("Although there is undoubtedly a public

interest in proceedings of this nature, the particular issues raised here relate more directly to the private interests of an individual in unique circumstances."). Simply put, the youth's unique and extensive needs, his history in other facilities, and the evolving nature of his behavioral challenges prevent us from generating an authoritative opinion that would guide the courts or the parties in *future* cases. *See Mainers for Fair Bear Hunting*, 2016 ME 57, ¶¶ 8-9, 136 A.3d 714 (explaining that, although an issue was "undoubtedly of public interest . . . . the core question at issue in th[e] case [was] not a generic question.").

[¶18] In the absence of a live controversy, the exceptional circumstances of this appeal do not present an opportunity for a definitive judicial pronouncement. Thus, the mootness exception for cases of great public concern does not apply. Because this appeal presents issues that are moot and because none of the exceptions to the mootness doctrine applies, we dismiss the appeal as moot.

The entry is:
Appeal dismissed.

12

Sarah E. Branch, Esq. (orally), Fairfield & Associates, Portland, for appellant A.I.

Christine Thibeault, Asst. Dist. Atty., Cumberland County District Attorney's Office, Portland, for appellee State of Maine

Aaron M. Frey, Attorney General, and Jason Anton, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Corrections

Aaron M. Frey, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Emma E. Bond, Esq., Zachary L. Heiden, Esq., and Meagan S. Sway, Esq., ACLU of Maine Foundation, Portland, for amici curiae ACLU of Maine Foundation and the Juvenile Law Center

Jeffrey M. Skakalski, Esq., and Peter Rice, Esq., Disability Rights Maine, Augusta, for amicus curiae Disability Rights Maine

Mary Bonauto, Esq, GLBTQ Legal Advocates and Defenders, Boston, Massachusetts, for GLBTQ Legal Advocates and Defenders

Courtney Beer, Esq., Kids Legal, Portland, for amicus curiae Kids Legal

Tina Heather Nadeau, Esq., Maine Association of Criminal Defense Lawyers, Portland, for amicus curiae Maine Association of Criminal Defense Lawyers

Maine Supreme Judicial Court docket number SJC-19-2
FOR CLERK REFERENCE ONLY